JOSEPH B. GIBLYN, Appellant, *v.* DOWNEY SHIPBUILDING
CORPORATION, Respondent.

Insurance — contract — action to recover premiums — insurance placed with foreign insurance companies by New York brokers through London brokers — payment of premiums by London brokers, at request of New York brokers, payment by latter — statement in letter from defendant that insurance was subject to confirmation by another — failure to obtain such consent no bar to recovery, where defendants knowing consent could not be obtained, kept the policies and the insurance.

1. Where defendant, a shipbuilding corporation, under contract to build certain vessels, insured some of them in English insurance companies through a New York insurance broker which placed the insurance through London brokers, who thereby became liable, under the English law, directly to the English companies for the amount of the premiums, defendant being informed of that fact, and who, at the request of the New York brokers, paid the premiums and charged the amount to the account of the New York brokers, which was paid by mutual credits and debits, payment by the London brokers was payment by the New York brokers, so far as defendant was concerned, and where the policies were thereafter delivered to it and it kept the same and received the benefit of the insurance, it is liable in an action to recover the premiums.

2. The facts that a letter from defendant to its New York brokers contained a statement that the insurance was to be subject to confirmation of the United States Shipping Board Emergency Fleet Corporation and that such consent had not been procured are not a bar to recovery of the premiums, where the condition was not insisted upon and, in the course of the negotiation going to make up the completed contract, was dropped. The defendant was the party to obtain the consent, if necessary, of the Shipping Board and where it did not do so nor return the policies nor notify the agents or companies to that effect, but, with knowledge that, by reason of its own act, it could not obtain the consent of the Shipping Board, it kept the policies and the insurance, it is in no position to plead its own default as a bar to payment of the premiums.

*Giblyn* v. *Downey Shipbuilding Corp.*, 219 App. Div. 709, reversed.

(Argued November 22, 1927; decided December 6, 1927.)

APPEAL, by permission, from an order of the Appellate Division of the Supreme Court in the first judicial department, entered January 31, 1927, unanimously affirming a judgment in favor of defendant entered upon a dismissal of the complaint by the court at a Trial Term without a jury.

*Frank I. Tierney* and *Wendell P. Barker* for appellant. By its acceptance and retention of the policies of insurance the defendant became obligated to pay therefor and waived the requirement of the approval of the Fleet Corporation. (*Reed* v. *Randall,* 29 N. Y. 358; *Coplay Iron Co.* v. *Pope,* 108 N. Y. 232; *Brown* v. *Foster,* 108 N. Y. 387; *Pierson* v. *Crooks,* 115 N. Y. 539; *Dunn* v. *Steubing,* 120 N. Y. 232; *Gentilli* v. *Starace,* 133 N. Y. 140; *Mississippi Shipbuilding Corp.* v. *Lever Bros. Co.,* 237 N. Y. 1; *Clark* v. *West,* 193 N. Y. 349; *Federal Sanitary Clearing & Refining Co.* v. *Loeb,* 147 App. Div. 737; *Darley* v. *Kendall Products Corp.,* 205 App. Div. 29.)

*F. A. W. Ireland, Edgar R. Mead* and *Henry C. Hunter* for respondent. The plaintiff failed to prove the cause of action alleged in the complaint. (*Kavanaugh* v. *Commonwealth Trust Co.,* 223 N. Y. 103; *Wallach* v. *Riverside Bank,* 206 N. Y. 434; *Mannheim* v. *Hollander,* 112 Fed. Rep. 549; *Lamphere* v. *Lang,* 213 N. Y. 585; *Walrath* v. *Hanover Fire Ins. Co.,* 216 N. Y. 220.)

CRANE, J. Willcox, Peck & Hughes was a domestic corporation engaged in transacting business as insurance broker and agent in the city of New York. At the times herein mentioned the Downey Shipbuilding Corporation was engaged in the business of constructing steamships at its shipyards at Arlington, Staten Island, New York.

On July 3, 1917, it was under contract with the United States Shipping Board Emergency Fleet Corporation for the construction of ten steel cargo ships. One of the provisions of the contract was that the builder agreed " to insure and keep insured at its own expense for the benefit of the owner, in insurance companies satisfactory to the owner, said vessels and all the materials and supplies for and to be used in construction under this contract against any and all damage by fire and marine risks, lightning, settling of staging, breakage of ways, and risks of launching during such construction and until final completion and delivery."

The ships were built in groups of four as there were only four shipbuilding ways.

In March of 1918 the owner, the Shipping Board, at the request of the Downey Shipbuilding Corporation, placed insurance on the ten vessels to be built under this contract. The builder considered the rate of premium charged on this insurance to be excessive, and on July 8, 1918, wrote to Willcox, Peck & Hughes asking for a quotation on the group of vessels to be built. The letter in part reads as follows:

" About six months ago one of our representatives discussed with you the subject of builders' risk insurance for group of ten 7,500-ton steel ' Standardized Steamships ' which we are building for the U. S. Shipping Board Emergency Fleet Corporation.    *    *    *

" Builders' risk insurance is placed upon the first four of our group of ten steamships.    *    *    *    Will you please write us your best quotations to cover builders' risk on our ships Nos. 5, 6, 7 and 8.    Price of each ship $1,162,500. Each to be covered for one year from date of laying keel, subject to monthly *pro rata* rebate of premium on any ship finished within twelve months."

The builder evidently did not realize that the owner at its request had placed insurance not upon four ships,

but to cover all ten, as they would be constructed in the course of time.

Willcox, Peck & Hughes replied on the 12th giving rate, followed by personal interviews with the officers, and on July 30, 1918, sent the following letter:

" Since our last conversation, we had an interview with Mr. Pessano going over the situation generally with him.  At his suggestion we cabled London to arrange for $1,160,500 each on six steamers to be built in your yards to attach from time of laying keels, as it seemed advisable to take advantage of the low quotation made by them."

Other letters followed, one of September 13, 1918, reading as follows:

" Referring to insurance placed for you on August 10th — builders' risk on 6 steamers for twelve months from date of laying keel, steamers valued at $1,160,500 each, we wish to ask you if it is not possible for you to give us the confirmation on this risk.

" You can appreciate that this insurance has been placed in London under firm orders as far as the London Underwriters are concerned and failure on our part to confirm this insurance or cancel it will involve us in earned premium.  We, therefore, ask you to give this matter your prompt attention."

The Downey Shipbuilding Corporation on September 17, 1918, answered these communications in a letter which has caused the trouble in this case.

" GENTLEMEN.— We are in receipt of your letter of September 13th, referring to insurance placed by you for our account on August 10th, 1918, to cover builders' risk on (6) duplicate steel steamships, our numbers five to ten inclusive which we are building for the U. S. S. B. Emergency Fleet Corporation.

" Subject to confirmation of our Board of Directors

and the U. S. S. B. Emergency Fleet Corporation the undersigned is pleased to confirm the negotiations and agreements between our Mr. A. C. Pessano and your good selves on this subject.

" Personally I prefer to place this business with you and will bring the matter up for confirmation at our Directors Meeting, the 19th instant.

" The original contract value on the ships referred to is $1,162,500 each, but subject to fluctuation in value *pro rata* as the cost of materials and labor differs from the cost of materials and labor specified in our original shipbuilding contract.

" Very truly yours,
" DOWNEY SHIPBUILDING CORPORATION
" WALLACE DOWNEY G.<br>" <em>President.</em>"

On September 19, 1918, the president, Wallace Downey, for his company again wrote Willcox, Peck & Hughes as follows:

" I am pleased to confirm to you that our Directors have approved closing Builders Insurance Risk with you. I hope and no doubt it will be entirely satisfactory to the United States Shipping Board Emergency Fleet Corporation."

To this the insurance brokers replied on the 20th as follows:

" We thank you for yours of the 19th, advising that your Directors have approved the closings of the Builders Risk insurance which we arranged."

On that same day the Downey Shipbuilding Corporation notified the agents that keels of ships Nos. 5 and 6 were officially laid. This was necessary to initiate the risk. Other correspondence followed regarding these matters up to October 8, 1918, when the builder wrote the following letter:

" Messrs. WILLCOX, PECK & HUGHES,
        " 3 South William Street,
                " New York City:
    " GENTLEMEN.— We have your letter of October 2nd, confirming placing of builders' risk insurance on six (6) of the ships which we are building, amounting to $1,160,520 each.
    " Thanking you for your attention, I am
                " Very truly yours,
    " DOWNEY SHIPBUILDING CORPORATION
                    " WALLACE DOWNEY
                        " G
                        " *President.*"

and another of same date reading as follows:
" WILLCOX, PECK & HUGHES,
        " 3 South William St.,
                " New York:
        " Subject: Insurance
    " GENTLEMEN.— Please send us insurance Policies covering Builders Risk Insurance in accordance with the arrangement made with our President, Mr. Wallace Downey.    Address same to Secretary.
                " Yours very truly,
                    " A. A. CANNON
                        " *Secretary.*"


    In the course of time as the policies were received from London they were delivered to the Downey Shipbuilding Corporation.    The total insurance approximated $7,000,000.    The premiums amounted to £5,568, 10s., or $25,942.24, for which Willcox, Peck & Hughes were liable to their London agent.    The Downey Shipbuilding Corporation had the benefit of this insurance.    It kept the policies, raised no objection as to any terms or conditions, and was fully insured in the amount above mentioned on the six vessels which it built up to the end

of the term of the insurance.   It never paid the premiums. This action is brought to recover those premiums.

Willcox, Peck & Hughes procured the insurance through its London agent, C. T. Bowring & Co.   Under section 53 of the English Marine Insurance Act of 1906, Bowring & Co. were directly liable for the premium and required to and did pay the same.   Both Willcox, Peck & Hughes of New York, and Bowring & Co. of London carried on a very extensive insurance business.   They were well-known brokers and agents.   Their transactions with each other amounted to many thousands of dollars each month. Balances due one to the other were remitted by cable periodically.   The premiums which Bowring & Co. had paid for this insurance were charged to Willcox, Peck & Hughes, and paid by mutual credits and debits, the appropriate balance being remitted in the regular course of business.   The treasurer of Willcox, Peck & Hughes testified: " If the Bowring account on our books showed that we owed London, which was the Bowring account, 50,000 pounds, I would remit them, say 25,000 pounds either by cable or by sight draft.   If, on the other hand, our books showed Bowring's account was running in our favor, I would cable Bowring and ask him for a remittance."

The book entries offered in evidence show these transactions, although the payments were made in lump sums covering many other transactions as well.

There is little dispute about the facts, which may be summarized as follows: The Downey Shipbuilding Corporation, under contract to build ten ships, insured six of them through Willcox, Peck & Hughes with English insurance companies.   Bowring & Co. of London, the agent placing this insurance for the New York brokers, was liable directly to the English companies under the English law for the amount of the premiums.   The builder was informed of this fact.   Bowring & Co. paid the

33

premiums at the request of Willcox, Peck & Hughes. In so doing it acted as the agent of that concern, and paid or advanced the premiums on its behalf. This was necessary in order to procure the insurance by the London companies. The amounts were charged to the New York brokers. Payment by Bowring was payment by Willcox, Peck & Hughes, so far as concerned the defendant, and the insurance which it obtained. We need not go as far, therefore, in this case as *Ward* v. *Tucker* (7 Wash. 399), which held that the actual payment of premiums by a marine insurance broker is not necessary before recovery from his principal. Here payment was made by the brokers through their London agent. Bowring & Co. was acting for Willcox, Peck & Hughes, not the defendant. The policies of insurance were delivered to the Downey Shipbuilding Corporation which for the period of the policies was insured for over $7,000,000. It has received the benefit of this insurance procured at its request and has failed and refused to pay the cost thereof. It is conceded that the premiums charged were very reasonable, and no fault whatever is found with the insurance or the work of the brokers.

How does it happen that the defendant has so far succeeded in this action? The statement in the letter of September 17, 1918, that the insurance was to be subject to the confirmation of the United States Shipping Board Emergency Fleet Corporation was held to be a bar to the plaintiff's recovery because such consent had not been procured. We do not so view the correspondence. This condition contained in the letter referred to was subsequently waived by the acts and statements of the parties. Perhaps waiver is an inappropriate term to use in connection with the situation. It would be more accurate to state that the proposed condition was not insisted upon, and that in the course of the negotiations going to make up the completed contract, was dropped. In all the letters, only a few of which have

been quoted here, this condition was referred to but once or twice. The insurance was procured at the request of the defendant; the directors of the defendant approved the placing of the insurance. Nearly two months after this letter of September 17th, the defendant demanded the policies; it kept the policies for the full period of the insurance and received all the benefits which those policies could give. In other words, at its request it received twenty-five thousand dollars' worth of insurance for which it has not paid. The defendant was the party to obtain the consent, if necessary, of the Shipping Board. It did not do so; neither did it return the policies upon failure to procure such consent or notify the agents or companies to that effect. It kept the policies and the insurance, and is, therefore, in no position to plead its own default as a bar to the payment of this claim. The defendant knew, or should have known, that the condition, if it be one, could not be fulfilled or carried out by reason of its own action. Almost six months before the insurance here referred to had been procured, the defendant insured the ten ships through the Shipping Board. It thought it had only insured four ships, but even a casual reading of its correspondence would have revealed that the request had been made for insurance upon all the ships. The rate charged by the Shipping Board was too high, so the defendant opened negotiations with Willcox, Peck & Hughes for the insurance upon the remaining six ships. The Shipping Board refused to cancel its insurance, so that the defendant knew that it could not procure the consent of the Shipping Board to the plaintiff's insurance. It may not have been conscious at the time it wrote the letter of September 17 of the fact that the Shipping Board at its request had already placed insurance on the six vessels; it should have known of its own previous correspondence. It did know this fact in the fall months of 1918, and yet continued its negotiations with the plaintiff's assignor, procured and kept the London insur-

ance. The condition was not performed because the defendant itself had made the performance impossible.

For these reasons the judgment of the Appellate Division and that of the Trial Term should be reversed, and as there is no material or substantial dispute of facts, judgment ordered for the plaintiff for the amount demanded in the complaint, with costs in all courts.

CARDOZO, Ch. J., POUND, ANDREWS, LEHMAN, KELLOGG and O'BRIEN, JJ., concur.

Judgment accordingly.